IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES LUCIANI                   :          CIVIL ACTION
                                     :          NO. 10-2918
       v.                   :
                                       :
CITY OF PHILADELPHIA, et al     :

O'NEILL, J.                                          October 1, 2013

## MEMORANDUM

Now before me is a motion for summary judgment by defendants the City of Philadelphia and Dennis R. Curcio and Robert Foglia, Co-Administrators of the Estate of Enrico Foglia, Deceased. For the reasons that follow, I will grant defendants' motion.

## BACKGROUND

Plaintiff James Luciani's claims in this action arise out of his alleged wrongful suspension and termination from the City's Board of Revision of Taxes for his alleged violation of the City's residency rule after he informed the City Controller's office about allegedly corrupt practices in the BRT. From 1985 until 2008, plaintiff was employed by the City of Philadelphia. Compl. ¶ 20. He worked for the BRT from 1989 until 2008 and at the time of the events giving rise to this action was a Real Property Evaluator. Compl. ¶¶ 21-22. In that capacity, plaintiff was charged with the responsibility of assigning a dollar value to large commercial properties in Center City Philadelphia including office buildings and similar structures for real estate tax purposes. Compl. ¶ 22. The BRT's valuations formed the basis for property tax assessments. Compl. ¶ 12. From 1991 until September 2009, Enrico Foglia was the Executive Director of the BRT. Compl. ¶ 9; Ans. ¶ 9. The BRT also had a board whose responsibilities included hearing and issuing decisions on property owners' appeals of their properties' assessed values. Compl. ¶ 13; Ans. ¶ 13.

## II.  Plaintiff's September 2007 Meeting with the City Controller's Office

In September, 2007, around Labor Day, plaintiff met with Philip Bridgeman and his supervisor, William Rempfer, of the Controller's office in connection with a City audit of the BRT's valuation of certain properties.  Dkt. No. 39 at ¶ 5; Dkt. No. 42 at ¶¶ 41, 43; Bridgeman Dep. at 4-5, 7-10, 12-17.  The Controller's office and the BRT were independent City departments.  Dkt. No. 42 at ¶ 42; Davey Dep. at 53-56 (explaining that the staff in the Controller's office "were accountants," not appraisers).

Bridgeman testified that Plaintiff initiated the meeting, claiming that he "[h]ad something to tell" the Controller.  Dkt. No. 42 at ¶ 43; Bridgeman Dep. at 12-13, 42-43.  At the meeting, plaintiff answered questions about the BRT's decisions to reduce the valuations of certain properties for which he was responsible.  Dkt. No. 39 at ¶ 6.  Plaintiff claims that at the meeting he "provided Bridgeman and Rempfer with facts and information which revealed and exposed a pervasive pattern of corruption in the BRT that was detrimental to the taxpayers of the City."  Dkt. No. 42 at ¶ 45.  Responding to questions at the meeting, plaintiff stated that the former Chairman of the BRT, David Glancey, had followed a practice of unilaterally entering into settlement agreements with property owners and/or their attorneys that substantially lowered property valuations.  Dkt. No. 39 at ¶ 7; Bridgman Dep. at 12:8-17:14, 20:9-21:8.  Plaintiff reported that two lawyers who were active in Democratic Party politics were involved in most of the private meetings resulting in large valuation reductions.  Dkt. No. 42 at ¶ 45(c);  Luciani Dep. I (Sept. 7, 2011) at 68-73, 77-82, 85-87.

Plaintiff contends that in October 2007, after his meeting with Bridgeman and Rempfer, Bridgeman and Rempfer scheduled a meeting with Charlesretta Meade, then the Chairperson of the BRT Board and certain BRT managers, including Eugene Davey, Robert Zambrano and

Barry Mescolotto[1] to discuss, inter alia, plaintiff's statements at his meeting with the Controller's office. Dkt. No. 42 at ¶ 47; Zambrano Dep. at 74-77, Bridgeman Dep. at 21-24. Zambrano testified that at the meeting, Meade expressed concern that plaintiff had made comments about Glancey to Bridgeman." Zambrano Dep. at 75:2-18 ("I'm starting to remember the meeting, that it concerned some of the deals that Dave Glancey made and that [plaintiff] probably shouldn't have brought him into it since he was going or gone at the time and . . . [Meade expressed the view that plaintiff p]robably shouldn't have brought that up. . . ."). Bridgeman testified that when plaintiff's criticism of Glancey came up at the October meeting, Meade and the other BRT employees "of course, denied it. Then, they wanted to know who the evaluator was." Bridgeman Dep. at 23:5-14. Bridgeman declined to identify plaintiff at the meeting, but testified that it was apparent from the discussion that it was plaintiff who had provided information about Glancey's alleged practices to the Controller's office. Id. at 23:13-22. Bridgeman testified that Meade and the other BRT employees expressed annoyance at the allegation against Glancey, saying "it didn't happen that way; they didn't have knowledge of it, let's put it that way." Id. at 23:23-24:7.

Plaintiff testified that after the meeting between the Controller and BRT management, Davey told him that Meade was "livid" because plaintiff had "spoke[n] out against the department" and had "besmirched the good name of Dave Glancey." Luciani Dep. I at 89-90, 92-93; Luciani Dep. II (Oct. 24, 2011) at 73-75. Zambrano testified that Davey told him that plaintiff would have a problem with Meade because she was upset that he had mentioned

---

[1] When asked whether it had come to his attention at any time before June 30, 2008 that plaintiff "had had a meeting with someone at the City Controller's, Mr. Bridgeman," Mescolotto testified that he "[didn't] know anything about that." Mescolotto Dep. at 61:15-20.

Glancey to the Controller. Zambrano Dep. at 133:2-24. Plaintiff has not, however, submitted any testimony from Davey about these conversations.

## II.    Plaintiff's Residence and the Residency Requirement

As a Civil Service employee, plaintiff was required to maintain his bona fide residence in the City. Compl. ¶ 38, Ans. ¶ 38; Phila. Civil Serv. Reg. § 30.01.[2] Plaintiff contends that while he was employed by the City, he always maintained a bona fide residence in the City. Luciani Dep. I at 4-5, 11-12, 15-16, 64-66; Ex. F (Pl.'s Ans. to Interrog. No. 9).

Plaintiff contends that from 1986 to 1994, he lived in the City on Clearfield Street. Dkt. No. 42 at ¶ 24. He testified that in 1994, he moved to 6642 Roosevelt Boulevard in Philadelphia. Luciani Dep. I at 12:16-23. He asserts that from late 2003 or early 2004, until he was terminated in July, 2008, he "maintained his residence at 2336 East Cumberland Street in Philadelphia." Dkt. No. 42 at ¶ 24, citing Luciani Dep. I at 4-5, 11-13, 64-65, and Ex. F. He contends that he owned and rented out the Cumberland Street property prior to 2004, moving in when his tenants vacated the property in late 2003. Dkt. No. 42 at ¶ 25. Plaintiff asserts that he moved in and hired contractors to do major renovation work because the tenants left the Cumberland Street property "in a deplorable condition." He claims that the renovation work "lasted several years" and that "[a]lthough [he] was able to stay and sleep in his Cumberland Street Residence most of

---

[2]    Regulation 30.01 provides, in relevant part,

> that every employee in the civil service shall establish his or her bona fide residence in the City within six months of his or her appointment, and shall thereafter maintain bonafide residence in the City . . . . The City Controller may require proof of the residence of any employee in the civil service.

Dkt. No. 39 at ¶ 9 n.3. Also, the Philadelphia Home Rule Charter, § 20-101, provides that "[e]very employee in the civil service shall establish his or her bona fide residence in the City within six months of his or her appointment, and shall thereafter maintain bona fide residence in the City." Id.

the time when the renovations were being performed, there were occasions when he decided to sleep at other locations within the City (including his mother's home on Bustleton Avenue and his aunt's house)." Dkt. No. 42 at ¶ 25, <u>citing</u> Luciani Dep. I at 4-5, 12-17; Luciani Dep. II at 27, 30, 65; Ex. G (Pl.'s Ans. To Interrog. No. 9). Plaintiff asserts that between 2004 and 2007, while he resided at the Cumberland Street property, "he used his mother's address on Bustleton Avenue in Philadelphia as his mailing address after discovering that contractors working at his Cumberland Street Residence had thrown out or lost some of his mail." Dkt. No. 42 at ¶ 32, <u>citing</u> Luciani Dep. I at 119-123.

To support his contention that he resided in Philadelphia during the time in question, plaintiff points to a voter registration card issued by the City in December, 2003. Dkt. No. 42 at ¶ 26, <u>citing</u> Hoover Dep. at 63-64, Mescolotto Dep. at 77-78 and Ex. H. Plaintiff testified that as of 2008, he had voted in the City for at least 20 consecutive years. Dkt. No. 42 at ¶ 28; Luciani Dep. II at 87-88. Plaintiff also cites his driver's license issued by the Commonwealth of Pennsylvania in January 2005 listing the Cumberland Street property as his address. Dkt. No. 42 at ¶ 27; Hoover Dep. at 62-63; Mescolotto Dep. at 77-78; Ex. I. Plaintiff notes that when he lived on Roosevelt Boulevard he had a telephone number with a Philadelphia area code and a listing in the Philadelphia White Pages phone directory. Dkt. No. 42 at ¶ 29; Luciani Dep. I at 64-65. He testified that when he lived at the Cumberland Street property beginning in 2004, he also had a telephone number with a Philadelphia area code. Dkt. No. 42 at ¶ 29; Luciani Dep. I at 64-66. He did not, however, have a land line, at the Cumberland Street address, and the Philadelphia area code he cites during that time period was associated with a cell phone. Luciani Dep. I at 64:3-11 ("When I moved back in, in '04, I just used the cell phone.").

Plaintiff contends that his BRT "supervisors and co-workers were well aware that he was living in the City." Dkt. No. 42 at ¶ 30, <u>citing</u> Luciani Dep. I at 43-46; Zambrano Dep. at 30, 46-47, 56-60 (testimony that he believed that Luciani lived in Philadelphia); Davey Dep. at 52-53 (testifying that he "never thought that [plaintiff] didn't live in the city"). Plaintiff also testified that Foglia had visited him once at Cumberland Street. Luciani Dep. I at 45. Plaintiff further asserts that while he was employed by the BRT, the City performed annual residency checks for all Civil Service employees. Dkt. No. 42 at ¶ 31. He submits testimony from Mescolotto that he "never showed up on any of those checks" as being a nonresident, Mescolotto Dep. at 32:3-4, and Zambrano's testimony that plaintiff "was always okay" when his residency status was checked. Zambrano Dep. at 46:16-17.

Plaintiff and his wife, Autumn Luciani, separated in 1992, but never divorced. Dkt. No. 42 at ¶¶ 34-35; Luciani Dep. I at 10-12, 18-20. After their separation, Autumn moved into 1028 Tatum Street, Woodbury, New Jersey. Dkt. No. 42 at ¶ 36; Luciani Dep. I at 10, 18-20. In a written separation agreement dated December 1992, plaintiff and Autumn agreed, inter alia, that:

> [i]t is understood and agreed that Husband and Wife own as tenants by the entireties, the real estate known as 1028 Tatum Street, Woodbury, NJ 08096. Said property was purchased on September 15, 1988 jointly by Husband and Wife for investment purposes. Husband agrees to allow wife to occup[y] property as her primary [residence] effective February 1, 1993. Wife agrees to be responsible for all utilities, taxes and mortgage payments. Wife agrees to hold harmless husband from any and all liability and/or claims and/or damages and/or expenses . . . that Wife may sustain, or for which she may become liable or answerable . . . with regard to said property for which Wife is liable under the terms of this Agreement. Husband agrees to allow [W]ife to reside in said property until such time it is mutually [agreed] upon to sell property.

Dkt. No. 42 at ¶ 38, <u>citing</u> Separation Agreement at ¶ 5. Plaintiff testified that Autumn has lived alone at the property since 1992. Luciani Dep. I at 20:2-5. He asserts that "they have not

reconciled or lived together at any time since they separated 20 years ago." Dkt. No. 42 at ¶¶ 34-35; see also Luciani Dep. I at 18-20, 184-85. Indeed, plaintiff's co-worker testified that he saw plaintiff with different women at BRT-sponsored functions. Dkt. No. 42 at ¶ 40; Davey Dep. at 49-50.

Plaintiff contends, however, that in 2007, when he was having renovations done at the Cumberland Street property, Autumn allowed him to store boxes of his personal belongings at the Woodbury, New Jersey property. Dkt. No. 42 at ¶ 56, citing Luciani Dep. I at 129-130, 138. He testified that his stuff had been stored in Woodbury for "[o]ver a year," that he stayed at the house "[a] few times" while Autumn was away and that he had and has a key to the Woodbury house. Luciani Dep. I at 138:3-21. Plaintiff testified that he drove to the Woodbury property to pick up some of his boxes on September 20, 2007. Dkt. No. 42 at ¶ 57; citing Luciani Dep. I at 129-31. While he was at the house, he claims that Federal Bureau of Investigation Special Agents Brian Nichilo and Ray Manna knocked on the door. Dkt. No. 42 at ¶ 58, citing Luciani Dep. I at 129-130; Ex. L., Nichilo Dep. at 226-29. Plaintiff claims he invited the FBI agents into the house, where they questioned him, "spen[ding] about five-minutes on residency questions, and an hour-and-55 minutes asking [him] about corruption in [his] department." Dkt. No. 39, Ex. C., Luciani Dep. I at 122:24-123:2.

Defendants contend that in or around October 2007[3], FBI Special Agent Nichilo told Thomas Steel of the City's Office of the Inspector General that during an interview regarding another matter[4] plaintiff had admitted that he lived in Woodbury, New Jersey. Dkt. No. 39 at

---

[3]     Steel spoke with Nichilo on or around October 24, 2007. See Steel Dep. at 305:21-306:8.

[4]     Plaintiff claims that the FBI agents were "hunting for information to use against [former Pennsylvania State Senator Vincent] Fumo." Dkt. No. 42 at ¶ 59. He has not, however, submitted anything other than his own speculation in support of his claims that the FBI's interest

¶ 10, <u>citing</u> Steel Dep. at 55:6-21, 241:12-243:6.  Plaintiff, conversely, testified that he never

admitted to Nichilo and Manna that he lived in Woodbury, saying instead that "[w]hen they

asked [him] what [he] was doing there [he] answered their questions honestly and told them to

look around at all the stuff that was laying around.  And they really didn't dwell too much on the

residency.  They were really interested in the corruption stuff."  Luciani Dep. I at 138:22-139:12.

In support of their contention that plaintiff violated the residency rule, defendants explain

that on September 26, 2007, days after the FBI visit to the house in Woodbury, plaintiff notified

the City of a change of address, identifying as his "new address, the Cumberland Street address.

Steel Dep. at 246:7-247:11.  Defendants aver that for a number of years before that date, plaintiff

had listed a Bustleton Avenue address as his residence, but that he did not live there.  Dkt. No.

39 at ¶ 12, <u>citing</u> Luciani Dep. I at 119:13-120:17.  Instead, defendants claim that the Bustleton

Avenue address was the retirement home where plaintiff's mother lived.  Dkt. No. 39 at ¶ 12,

<u>citing</u> Luciani Dep. I at 119:13-120:17; <u>see also</u> Luciani Dep. I at 121:15-18 ("She had her own

apartment, which wasn't assisted living, it was just like an apartment in a retirement community,

which had a sleep sofa if I wanted to stay there.").  Defendants also assert that from 2000

through 2007, plaintiff listed the Cumberland Street address as a "real estate interest" on annual

---

in plaintiff had anything to do with the investigation of Senator Fumo.  Instead, the FBI's interest
in plaintiff was connected to "their investigation involving BRT employee James Lynch, in
which developer James Campanella gave Lynch $20,000 for assistance with various real estate
problems . . . ."  Dkt. No. 39 at Ex. E.  As plaintiff testified, when the FBI agents arrived at his
door, they asked him about where he lived and "said well, we want to ask you some questions
about Lynch Campanella."  Luciani Dep. I at 131:5-10.  He further explained that after being
questioned for about five minutes about his residence, he "said, well, what are you really here
for, and they said we want to know what's going on in your department," asked him what he
knew about corruption and "questions about the Lynch Campanella episode."  Luciani Dep. I at
131:18-136:17.  Likewise, Steel testified that "one of the allegations [the FBI agents] were
investigating was whether [plaintiff's] involvement with a developer by the name of James
Campanella, which was criminal in nature, they wanted to see his financial records to see if he
reported all his real estate."  Dkt. No. 42, Ex. M. Steel Dep. at 55:9-18.

financial disclosure forms required for public employees by the Commonwealth. Dkt. No. 39 at ¶ 13, <u>citing</u> Luciani Dep. II at 58:10-67:11. Plaintiff's interview by the FBI took place on September 20, 2007, less than a week before plaintiff changed his address to the Cumberland Street address. Dkt. No. 39 at ¶ 18, <u>citing</u> Ex. E. Plaintiff testified that he changed his address in his City personnel record because during his September 20, 2007 interview with the FBI, the FBI agents threatened to get him fired for non-residency status. Dkt. No. 39 at ¶ 19, <u>citing</u> Luciani Dep. I at 122:11-123:2.

Defendants contend that after plaintiff reported his change of address, the OIG conducted an investigation into whether plaintiff lived at the Cumberland Street address or if he, in fact, lived in Woodbury, New Jersey. Dkt. No. 39 at ¶ 14, <u>citing</u> Steel Dep. at 301:24-304:22; 334:18-336:20, and Ex. E. Steel interviewed plaintiff about his residency on or about January 10, 2008 and again on or about March 12, 2008. <u>See</u> Dkt. No. 39, Ex. E.; Steel Dep. at 334:15-16. On or about February 4, 2008, the OIG sent a letter to plaintiff at the Woodbury, New Jersey Address informing him that "[a] recent inquiry determined that you may be in violation of the City's residency regulations; and as such, you are now the subject of a residency investigation." Dkt. 39, Ex. F. The letter asked him to provide certain documentation as proof of residency at a "Residency Verification Interview with the OIG. <u>Id.</u> Plaintiff testified that he provided the OIG with the requested documents. Luciani Dep. I at 108:6-14.

On June 6, 2008, the OIG issued a report detailing its investigation into plaintiff's residency and concluding that plaintiff resided in Woodbury, New Jersey, not at Cumberland Street. Dkt. No. 39 at ¶ 17, <u>citing</u> Ex. E. The report described the documents plaintiff provided to prove his residency:

> Driver's License; State Farm Insurance bills for home insurance and car insurance; Water Revenue Bureau bill for the period

> November 13, 2007 to December 12, 2007; PECO bill dated
> December 19, 2007, Comcast Bill for December 2007; and a
> December 2007 Police and Fire Federal Credit Union Statement
> with attached 2007 Mortgage/Interest statement.

Dkt. No. 39, Ex. E. The report noted that "[a]ll of the aforementioned documents reflected Luciani's name and address as 2336 E. Cumberland Street, Philadelphia, PA 19105." Id. On June 9, 2008, the OIG sent a copy of the report to Foglia, advising him that the OIG "investigation confirmed that Luciani resided in Woodbury, N.J." Id. Plaintiff was not copied on the June 9 letter. Id.

## III. Plaintiff's Residency Hearing, Suspension, Termination and Grievance

On June 18, 2008, the City sent plaintiff a letter formally charging him with violating the residency rule. Compl. Ex. B. The letter advised plaintiff that the charge was based on "information provided by the inspector General and the Federal Bureau of Investigation." Compl. ¶ 39 and Compl. Ex. B. Specifically, it stated that "[a] recent investigation by the City's Inspector General has concluded that you have been in violation of this requirement by establishing and maintaining your bona fide residence in Woodbury, New Jersey." Compl. Ex. B. The letter told plaintiff that "based on the information provided . . . the [BRT] intend[ed] to suspend [him] for thirty calendar days and to dismiss [him] for alleged violation of the residency requirement," that a hearing had been scheduled for Monday June 30, 2008 and that, at the hearing he would "have an opportunity to answer the specific charges [identified in the letter] and to present witnesses on [his] behalf." Compl. Ex. B. It also informed plaintiff that he had "the right to Union representation at the hearing." Id. The letter was mailed to plaintiff at the Cumberland street address. Compl. Ex. B.

After receiving a copy of the June 18, 2008 letter, Judy Hoover, plaintiff's union[5]

representative, emailed Veronica Daniel, the Administrative Services Director for the BRT,

asking for "specific reasons for the dismissal or demotion" and a summary of "the facts in

support thereof with sufficient particularity to allow the employee to prepare a defense to the

charges" and stating, inter alia, that she "would also like to know the specifics and have copies of

any [OIG] reports and/or FBI reports so that we can properly prepare for this hearing."  Dkt. No.

42, Ex. U.  Daniel responded with an email stating, in relevant part, that

> [t]he charge against the employee is stated on the [June 18, 2008
> Letter] (violation of residency requirement) and the facts are
> contained in the [OIG's] report as indicated in the letter.  As of
> now I have been advised to inform you that the [OIG's] report is a
> confidential document that will be used as part of the BRT's
> evidence in the charges against the employee.

Id.

Plaintiff appeared at the hearing on June 30, 2008, accompanied by Autumn Luciani and

two union representatives, Hoover and Murray Costin.  Dkt. No. 39 at ¶ 23; Luciani Dep. I at

183:24-184:3; Hoover Dep. 17:20-19:20.  Also present at the hearing  were Foglia, Zambrano,

Mescolotto and Daniel.  Dkt. No. 39 at ¶ 106; Luciani Dep. I at 183-184; Zambrano Dep. at 11-

13, 42-44; Hoover Dep. at 24; Daniel Dep. at 13-16.  Hoover testified that at the outset of the

hearing, she again requested a copy of the OIG report, but was denied a copy because "it was

confidential."  Hoover Dep. at 56:22-57:13.

Daniel testified that in a discussion outside of the hearing room before any witnesses

testified, Foglia "made it clear that we hadn't made our decision yet."  Daniel Dep. at 97:6-8.

After hearing from the witnesses present at the hearing, including Autumn Luciani, Foglia told

---

[5]      Plaintiff was a member of the American Federation of State, County and
Municipal Employees, AFL-CIO, AFSCME, District Council 47, Local 2187.  Dkt. No. 39 at ¶
43.

the other BRT managers that he needed time to think before terminating plaintiff. Luciani Dep. I at 185:10-13; 187:24-188:5. The BRT managers left the room. Id. at 188:5-189:1. Foglia then spoke by telephone with two people in the OIG, including Kathleen McAfee. Zambrano Dep. at 79:13-81:11; McAfee Dep. at 55:14-57:7. Zambrano testified that during the call to the OIG, he wanted to know "what they had other than someone saying, be it FBI or not, that [plaintiff] lived outside the City." Zambrano Dep. at 80:8-10. Zambrano testified that they were told that "other than the interview with the investigator and the FBI going to the house, they had nothing at all." [6] Id. at 80:13-15. McAfee testified that she told Foglia that "the mayor would suggest that you follow the recommendation of the inspector general [that plaintiff did not live in Philadelphia], but it's your decision." McAfee Dep. at 56:5-6, 21-23. Zambrano testified that "when we hung up the phone [Foglia's] first statement was, 'I guess I got to fire [plaintiff].'" Zambrano Dep. at 80:9-10. Ultimately, at the close of the hearing, plaintiff was presented with a "Notice of Suspension Without Pay" signed by Foglia and dated June 27, 2008, three days prior to the hearing. Dkt. No. 42 at ¶ 119; Compl. Ex. C.

Plaintiff, for his part, claims that the hearing "was nothing more than a sham," Dkt. No. 42 at ¶ 104. He contends that, because the suspension notice was dated three days prior to the hearing, defendants "made the decision to suspend and discharge [him] prior to his disciplinary

---

[6]     The OIG report referenced the documents submitted by plaintiff, but did not discuss the information contained therein. Mescolotto testified, however, that

> [t]here was a discussion, or there was [sic] some questions and discussion about the utility bills that were presented . . . I think [Foglia] questioned, as I think other people did, and I will include myself in that, how these particular utility bills could show so little usage and have someone living in the property full time.

Mescolotto Dep. at 109:1-10. At his deposition, Steel testified that the water usage for the property "was either zero or one" Steel Dep. at 335:4-10. He further testified that he believed that there was "[v]ery little" electrical usage at the Cumberland Street property. Id. at 336:12-20.

hearing, in alleged retaliation for having spoken out about corruption in the BRT." Dkt. No. 42 at ¶ 102 (emphasis omitted). In support of his contention, plaintiff notes that when Zambrano was asked whether there was "anything [he] could think of that [plaintiff] could have presented by way of evidence that would have changed the outcome" of the hearing, Zambrano testified "not in hindsight, no." Zambrano Dep. at 138:8-11. Plaintiff also asserts that he was "not allow[ed] to testify in his own defense." Dkt. No. 42 at ¶ 110. To prove his assertion, plaintiff submits Zambrano's testimony that he was "pretty sure [plaintiff] tried to speak and didn't." Zambrano Dep. at 53:20. Plaintiff acknowledged, however, that "Judy Hoover presented the witnesses and evidence as my representative." Luciani Dep. I at 195:2-11.

Plaintiff was suspended without pay from July 1 to July 31, 2008. Luciani Dep. II at 9:9-14. The Notice of Suspension included a paragraph advising plaintiff that he had the right to appeal the suspension to the Civil Service Commission. Compl. Ex. C. Instead, on June 30, 2008, Hoover filed a union grievance on plaintiff's behalf alleging, inter alia, that the disciplinary action against plaintiff was without just cause.[7] Hoover Dep. at 31-32; Dkt. No. 42, Ex. V. On July 1, Hoover sent the City a written request for a copy of the OIG report. Dkt. No. 39, Ex. L. The union was provided with a copy of the report on or around July 16, 2008. Dkt. No. 39, Ex. L; see also Hoover Dep. 36:9-19; 68:13-69:12.

On July 11, 2008, the City mailed to plaintiff a "Notice of Intention to Dismiss." Dkt. No. 39, Ex. M; see also Luciani Dep. II at 6:10-12 (acknowledging receipt of the notice). On

---

[7]     Plaintiff's right to appeal to the Civil Service Commission was foreclosed by the filing of his union grievance, as under the applicable collective bargaining agreement, plaintiff could not pursue both a union grievance and a Civil Service Commission Appeal. See Dkt. No. 42, Ex. R; see also Luciani Dep. I at 190-93; Luciani Dep. II at 6-9; Hoover Dep. at 32-33 ("We told him that if he went to the Civil Service Commission, that he would not be able to go through the [union] arbitration process," and that the union "doesn't have much faith in the civil service system . . . ."), 37-39 ("We have the ability to go through the arbitration process or civil service, but not both.").

July 17, 2008, Foglia signed and the City mailed to plaintiff a "Notice of Dismissal" which reiterated the Inspector General's conclusion that plaintiff had violated the residency requirement, citing the findings of the Inspector General and the FBI. Compl. Ex. D. Effective July 31, 2008, plaintiff was terminated. Compl. ¶ 56.

His union ultimately demanded that plaintiff's grievance be submitted to binding arbitration pursuant to the collective bargaining agreement. Luciani Dep. II at 10:5-10. After several delays, plaintiff's arbitration hearing was scheduled to proceed on March 17, 2010. Hoover Dep. at 40:4-12. On the day of the scheduled arbitration, plaintiff appeared with Hoover and Ralph Teti, an attorney retained by the Union. Luciani Dep. II at 10:16-11:16. Two witnesses for plaintiff subpoenaed by Teti also appeared to testify at the hearing. Luciani Dep. II at 10:16-11:16. Steel from the OIG and Nichilo from the FBI also were present to appear at the hearing. Luciani Dep. II at 11:16-22. Despite the presence of these witnesses, after a discussion with Teti, plaintiff decided not to proceed with the arbitration hearing. Luciani Dep. II at 10:10-12:16; 14:12-20. Asked at his deposition whether he "underst[oo]d what [he] was going to get in exchange for withdrawing [his] grievance," plaintiff testified that he "just wanted out of the process. . . . I just didn't think that I wanted to go any further. I wasn't going to go two more years with it." Luciani Dep. II at 14:12-20.

On March 18, 2010, Teti sent a letter to the City's attorney setting out "the terms of the settlement agreement between the Union and the City which were reached following discussions at the arbitration hearing on March 17, 2010." Dkt. No. 39, Ex. O.

Plaintiff claims that shortly after the terminated arbitration hearing, he met with Shalita Thomas in the City's pension office and learned that, because he was over 55 years old and had more than 22 years of service with the city, he had the right as of the date of his 2008 dismissal,

to commence his retirement and that he was entitled to make his retirement retroactive to the effective date of his separation. Luciani Dep. II at 17:21-20:1. Plaintiff testified that, as a result, he decided to withdraw his grievance and chose to retire. Id. at 14:6-20; 26:16-23. On April 9, 2010, plaintiff wrote a letter to the City Board of Pensions and Retirement, notifying the City that he was "requesting [his] retirement from the City of Philadelphia effective July 1, 2008" and further, that he had "withdrawn [his] grievance with the Union D.C. 47. Instead, . . . opt[ing] to keep existing service time as of [his] separation date on June 30, 2008." Dkt. No. 39, Ex. P.

Even though plaintiff had informed the pension office that he had already withdrawn his grievance, in May 2010, the City provided plaintiff and his union with a copy of a draft agreement to resolve the grievance. Luciani Dep. II at 22, 89; Dkt. No. 42, Ex. X. Under the terms of the draft agreement, plaintiff's termination would be changed to a retirement retroactive to the date of his separation. Dkt. No. 42, Ex. X. The draft agreement also included, in paragraph 6, a provision where by Luciani would have "agree[d] to release the City, its departments, boards, agencies, officials, employees and agents from any claims he had, has or may have against them arising out of the subject matter of [his] grievance and demand for arbitration." Dkt. No. 42, Ex. X at ¶ 6. Plaintiff did not sign the draft agreement. Luciani Dep. II at 19:24.

Plaintiff testified that he refused to release his claims against the City, believing he would not have received a benefit from the proposed settlement. Luciani Dep. II at 91:14-93:11. Instead, on May 17, 2010, plaintiff and Judy Hoover, on behalf of his union signed a version of the original proposed settlement agreement that he had unilaterally altered. Dkt. No. 42 at Ex. Y; see also Luciani Dep. II at 89-93; Hoover Dep. at 44-46, 76-77. Plaintiff made unilateral

revisions to the draft agreement, including the deletion of paragraph 6 and the addition of the following language:

> In further consideration of the foregoing, the grievance listed is withdrawn. Luciani declined the settlement and chose to retire retroactive as of his separation date from the BRT. There was no gain from the grievance process. The right to retire was an option at the time of separation from the city.

Dkt. No. 42, Ex. Y at ¶ 3; see also Luciani Dep. II. at 90-91 (testifying that "I took out the paragraph that indicates that I would lose my right or relinquish my right to sue the City . . . [for] any claims against them in the future"); id. at 92-93 ("I wanted it understood . . . that whatever happens I didn't want to relinquish my right to sue after the fact in Federal Court").

Plaintiff filed his complaint in this action on June 17, 2010. See Compl. On July 1, 2010, plaintiff's revised version of the settlement agreement was signed on behalf of the City by Diane A. Lobell, Esquire. Dkt. No. 42, Ex. Y.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23. If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Id.  A fact is "material" if it might affect the outcome of the case under governing law.

Id.

    To establish "that a fact cannot be or is genuinely disputed," a party must:

        (A) cit[e] to particular parts of materials in the record, including
        depositions, documents, electronically stored information,
        affidavits or declarations, stipulations (including those made for
        purposes of the motion only), admissions, interrogatory answers,
        or other materials; or

        (B) show[ ] that the materials cited do not establish the absence or
        presence of a genuine dispute, or that an adverse party cannot
        produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in

its favor" in order to overcome a summary judgment motion and cannot survive by relying on

unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W.

Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact

should be ascertained by resolving all inferences, doubts and issues of credibility against" the

movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation

marks omitted).

## DISCUSSION

**I.    Procedural Due Process**

    To establish his claim for denial of procedural due process under 42 U.S.C. § 1983,

plaintiff must show that "(1) he was deprived of an individual interest that is encompassed within

the Fourteenth Amendment's protection of life, liberty or property, and (2) the procedures

available to him did not provide due process of law."  Iles v. deJongh, 638 F.3d 169, 173 (3d Cir.

2011).  It is not disputed that, for purposes of his procedural due process claim, plaintiff had a

constitutionally protected property interest in not being terminated or suspended from his

position with the BRT without a showing of just cause.  See Dkt. No. 39 at 12-13; Dkt. No. 42 at 39.[8]  Rather, the question is whether the procedures followed in terminating plaintiff comported with due process.  Defendants contend that "the totality of the administrative process Luciani received in connection with his suspension and termination satisfied the fundamental requirement of due process."  Dkt. No. 39 at 15 (internal quotation omitted).  Plaintiff challenges both "the adequacy of the pre-termination hearing he received from the City," Dkt. No. 42 at 42, and contends that he "received no benefit from the grievance process."  Id. at 47.

"An essential principle of due process is that a deprivation of life, liberty or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985), quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950).  Under Loudermill, due process "requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment."  Loudermill, 470 U.S. at 542 (citations and internal quotation omitted).

### A.      Pre-Termination Due Process

"[T]he pre-termination hearing . . . should be an initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."  Id. at 545-46.  Defendant asserts that plaintiff's June 30, 2008 pre-termination hearing was constitutionally adequate.  Plaintiff

---

[8]      Pursuant to Philadelphia Civil Service Regulation section 17.01, as a public employee, plaintiff was permitted to be terminated only for just cause.  Dkt. No. 39 at 12-13. Further, pursuant to 53 Pa. Stat. § 12638, "[n]o officer, clerk, or employe[e] in the classified civil service of [the City] shall be removed, discharged, or reduced in pay or position, except for just cause."  See also Robb v. City of Phila., 733 F.2d 286, 292-93 (3d Cir. 1984) (finding that 53 Pa. Stat. § 12638 grants a property right to continued employment to civil servants employed by the City).

counters that he was deprived of his right to a proper pre-termination hearing. He first complains that because he was not provided with a copy of the OIG report before his hearing, he was not able to defend himself against the contention that he had admitted to the FBI agents that he lived in New Jersey. Dkt. No. 42 at 45-46. Defendants argue that the hearing was not rendered inadequate by the fact that the full OIG report was not provided to plaintiff or his union until after his hearing. Dkt. No. 39 at 16. I agree with defendants.

"[P]retermination notice of the charges and evidence against an employee need not be in great detail as long as it allows the employee 'the opportunity to determine what facts, if any, within his knowledge might be presented in mitigation of or in denial of the charges.'" McDaniels v. Flick, 59 F.3d 446, 457 (3d Cir. 1995), quoting Gniotek v. City of Phila., 808 F.2d 241, 244 (3d Cir. 1986); see also Parker v. City of Williamsport, 406 F. Supp. 2d 534, 550 (M.D. Pa. 2005) ("[N]otice need not be in advance, so long as the timing of the notice does not deprive the employee from telling his side of the story."). Plaintiff was aware that his claimed Philadelphia residency was in question before the hearing. The June 18, 2008 letter expressly stated that the charges against him were based on information provided by the OIG and the FBI. Compl. Ex. B. He knew that the FBI had questions about his residency by virtue of the questions the agents asked him when he was interviewed at the Woodbury, New Jersey property on September 20, 2007. Based on the information available to him prior to the hearing, plaintiff had a sufficient opportunity to determine that he would be required to present facts in support of his claimed Philadelphia residency at the hearing. Indeed, he admits that he was given an opportunity to present witnesses at the hearing in order respond to the charges against him, explaining that "Autumn Luciani . . . indicated to the panel that she had been living alone [at]

1028 Tatum Street in Woodbury."  Luciani Dep. I at 184:18-20.  Further, he acknowledged that Hoover had presented witnesses and evidence on his behalf.  Luciani Dep. I at 195:2-11.

To the extent that plaintiff complains that he was not permitted to give oral testimony at his hearing, I find that this objection is also insufficient to establish that he was denied sufficient pre-termination due process.  If Hoover's testimony is to be believed, Luciani did, in fact speak at the hearing.  She explained that "one of the reasons [the hearing] took so long was because [plaintiff] was so intent on showing them every document, every utility bill to prove himself." Hoover Dep. at 29:21-23.  Asked whether plaintiff "actually went through [his packet of documents] and talked about what was in there," Hoover replied, "[y]es."  Id. at 30:3-6.  She noted, however, that "the only person [sic] that really was listening was Bob Zambrano and Mr. Foglia.  Barry Mescolotto basically knew that this was a done deal."  Id. at 29:23-30:2.  Plaintiff himself testified that when he realized he was getting suspended "[he] blurted out, what about my voting records and what about the fact that I have all these documents."  Luciani Dep. II at 87:17-20.  Moreover, there is no "inexorable requirement that oral testimony must be heard in every administrative proceeding in which it is tendered."  Fed. Deposit Ins. Corp. v. Mallen, 486 U.S. 230, 247-48 (1988), citing Califano v. Yamasaki, 442 U.S. 682, 696 (1979).  Plaintiff has not presented sufficient evidence to allow me to conclude that his pre-termination hearing did not provide a constitutionally adequate opportunity for him to present his side of the story.

Plaintiff also complains that

> there is compelling evidence in the record that the City made the decision to suspend and discharge [him] prior to his "hearing" of June 30, 2008; and that the 'hearing' was therefore nothing more than a sham, at which the Hearing Panel simply reaffirmed and ratified the City's predetermined ruling – without regard for or consideration of the evidence Plaintiff attempted to present at his "hearing".

Dkt. No. 42 at p. 42-43. I note first that plaintiff's reliance on <u>Gooden v. Township of Monroe</u>, No. 05-2472, 2005 WL 56196, at *4 (D.N.J. Mar. 7, 2006) is misplaced, as in <u>Gooden</u>, the plaintiff's salary and benefits were discontinued prior to his pre-termination hearing. In this case, plaintiff received a hearing (even if it was not impartial) before his suspension and termination were effective.

Anticipating plaintiff's argument, in their brief defendants counter that "due process does not require that a pretermination hearing be held before an unbiased decision-maker." Dkt. No. 39 at 17. The Court of Appeals has held that an impartial decisionmaker is not required at the pre-deprivation stage provided that the state provides a neutral tribunal at the post-termination stage that can resolve charges of improper motives." <u>McDaniels</u>, 59 F.3d at 460. Plaintiff was entitled to just such a post-termination proceeding here. Accordingly, he cannot support his claim with cases from other circuits that have not adopted the rule set forth in <u>McDaniels</u>. <u>See, e.g.</u>, <u>Ryan v. Ill. Dep't of Children and Family Servs.</u>, 185 F.3d 751, 762 (7th Cir. 1999); <u>Levesque v. Town of Vernon</u>, 341 F. Supp. 2d 126, 134-35 (D. Conn. 2004).

### B. Post-Termination Due Process

Even if I were to find that plaintiff's pre-termination hearing was defective, his due process claim is insufficient to withstand defendants' motion for summary judgment because he did not take full advantage of available post-termination processes. To state a claim for a procedural due process violation, plaintiff must have engaged in the post-termination processes that were available to him, unless those processes were "unavailable or patently inadequate." <u>Solomon v. Phila. Hous. Auth.</u>, 143 F. App'x 447, 453 (3d Cir. 2005), <u>citing</u> <u>Alvin v. Suzuki</u>, 227 F.3d 107, 116 (3d Cir. 2000). "If there is a process on the books that appears to provide due

process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." Alvin, 227 F.3d at 116.

Two post-termination processes were available to plaintiff: an appeal through the grievance and arbitration process available under his union contract and an appeal of the BRT's action to the Civil Service Commission. Both procedures allowed for a full post-termination hearing before an unbiased factfinder, an opportunity to testify on his own behalf, to present witnesses and to cross-examine witnesses called by the City. Either body had the authority to provide plaintiff with a full remedy. Plaintiff chose to proceed with a union grievance and to forego an appeal to the Civil Service Commission. Ultimately he unilaterally elected to withdraw his union grievance.

In a footnote in his response to defendants' motion for summary judgment, plaintiff asserts that "there is evidence from which a jury could find that, under the circumstances, the post-deprivation procedure was patently inadequate." Dkt No. 42 at 47 n.13. He notes that he "had to wait nearly two years for his union arbitration hearing to be scheduled, at which time he was under severe financial distress," and that at the arbitration, the union's attorney informed him "that the case would be delayed for an additional two years before there was a final ruling by the arbitrator." Id. At his deposition, plaintiff complained that he "never got the impression that" Teti, "the lawyer that was on retainer from the Union,"

> was interested in this case. I got the impression that he was
> distracted, not focused, just retire and be happy, why do you want
> to go back to the rats nest BRT, why do you think somebody's
> going to believe you and not the FBI. . . . So I was very skeptical
> that he was looking out for my best interest, but I proceeded
> because I knew I was right.

Luciani Dep. II at 10:17-11:7. He continued

> I believe that, in my own personal opinion, that from day one he was just giving me the bum's rush on this whole – this case. . . . I didn't have any confidence in him. And at that point, I realized I just wanted to get out of this thing and be done with it, regardless of whether I – whatever I – if I got nothing, if I got a dime, whatever, I wanted out.

Id. at 11:24-12:9. To the extent that plaintiff believed his union did not adequately represent his interests in the post-termination grievance proceedings, "that is a claim more appropriately addressed through an action against the union itself." Skrutski v. Marut, 288 F. App'x 803, 809 (3d Cir. 2008). Plaintiff has not shown that the post-termination procedures available to him were per se inadequate or not followed. Accordingly, defendants are entitled to judgment in their favor on plaintiff's procedural due process claim.

## II. Substantive Due Process

"The substantive component of the Due Process Clause limits what government may do regardless of the fairness of procedures that it employs." Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 399 (3d Cir. 2000). Plaintiff contends that the City violated his substantive due process rights, arguing that Steel "had to know that Plaintiff was a resident of the city." Dkt. No. 42 at 50. He claims that despite such alleged knowledge, Steel "ignored or remained willfully indifferent to the overwhelming evidence that proved Plaintiff was a resident of the City." Dkt. No. 49 at 50. Plaintiff further contends that "Steel incorporated the false evidence into his own report to the OIG" and that despite having assured plaintiff that Steel "and the OIG would abandon the pending residency investigation, . . . he subsequently reported that Plaintiff had made the confession to Nichilo, which ultimately caused Plaintiff to lose his job." Dkt. No. 49 at 50. Plaintiff argues that "[a] jury could reasonably find . . . that Foglia, Daniel, Mescolotto and Meade knew or were deliberately indifferent to the fact that the claim Plaintiff

had been living in New Jersey with his wife for 20 years was a complete fabrication." Dkt. No. 49 at 51. Finally, plaintiff contends that "

> [a] reasonable jury could find that the City's decisionmakers sought to punish Plaintiff for speaking out about corruption to the Controller and the FBI; and that they were motivated to latch onto any evidence or theory, whether true or false, that would cause harm to Plaintiff. . . . The jury could therefore conclude that the City's decisionmakers ratified Steel and Nichilo's unconstitutional acts, and find the City liable on Plaintiff's substantive due process claim.

Dkt. No. 42 at 52.

To determine whether plaintiff has been deprived of substantive due process, I must first define "the exact contours of the underlying right said to have been violated." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 842 n.5 (1998). Although plaintiff's complaint does not explicitly plead a substantive due process claim, in his response to defendants' motion, plaintiff claims that the City violated his "fundamental right under the Fifth and Fourteenth Amendments to be free from injury caused by governmental agents who falsify documents or fabricate evidence." Dkt. No. 42 at 49. Plaintiff also claims a violation of his "fundamental right to be free from deliberate injury caused by law enforcement officials who run amok." Dkt. No. 42 at 50.

The Court of Appeals for the Second Circuit has held that "there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty." Zahrey v. Coffey, 221 F.3d 342, 344 (2d Cir. 2000). Plaintiff has not, however, set forth any controlling law from this circuit that holds that the rights which he claims defendants violated are fundamental rights subject to substantive due process protections. Further, despite plaintiff's contentions to the contrary, I find that he has not

set forth any evidence to show that Steele intended to use plaintiff's allegedly false New Jersey residency confession against plaintiff when he reported the information to the OIG.

Also, to the extent that plaintiff contends that defendants' alleged conduct deprived him of a fundamental liberty interest, the cases on which plaintiff relies to establish the existence of such an interest, see Dkt. No. 42 at 49, are inapposite. Defendants did not use plaintiff's alleged false confession of New Jersey residency to manufacture a pretense of probable cause for plaintiff's arrest or to obtain plaintiff's criminal conviction. Cf. U.S. ex re. Moore v. Koelzer, 457 F.2d 892, 894 (3d Cir. 1972) (holding that the plaintiff had a viable claim against FBI agents who used allegedly false documents to obtain a guilty verdict against the plaintiff); Laughman v. Pennsylvania, No. 05-1033 2007 WL 2345295, at *8 (M.D. Pa. Aug. 16, 2007) (holding that the plaintiff's allegations that a chemist for the police had altered her findings to match a fabricated confession were sufficient to state a substantive due process violation where the plaintiff was incarcerated for sixteen years as a result of the altered evidence). Rather, plaintiff claims that defendants' alleged conduct ultimately deprived him not of his liberty, but of his job with the BRT.

To the extent that plaintiff's substantive due process claim rests on his contention that defendants' alleged conduct deprived him of his continued employment with the BRT, plaintiff's substantive due process claim cannot proceed. His continued employment with the BRT is not a fundamental property interest for purposes of stating a substantive due process claim. See Savokinas v. Pittston Twp., No. 06-0121, 2006 WL 2382256 (M.D. Pa. Aug. 16, 2006) ("Public employment is not a 'fundamental' property interest under the due process clause."), citing Nicholas v. Pa. State. Univ., 277 F.3d 133, 140 (3d Cir. 2000) (holding that tenured public

employment is not a fundamental property interest entitled to substantive due process

protection).

> [W]hen a plaintiff challenges a non-legislative state action (such as
> an adverse employment decision), we must look, as a threshold
> matter, to whether the property interest being deprived is
> "fundamental" under the Constitution.  If it is, then substantive due
> process protects the plaintiff from arbitrary or irrational
> deprivation, regardless of the adequacy of procedures used.  If the
> interest is not "fundamental," however, the governmental action is
> entirely outside the ambit of substantive process and will be upheld
> so long as the state satisfies the requirements of procedural due
> process.

Nicholas, 227 F.3d at 142 (3d Cir. 2000).  Because plaintiff has not established the requisite

fundamental interests, he cannot proceed to trial on a substantive due process claim.[9]

---

[9]    Even if the rights to which plaintiff claims he was entitled were "fundamental"
rights, the record does not establish that defendants' conduct was conscience-shocking.

> [T]he measure of what is conscience shocking is no calibrated yard
> stick and deliberate indifference that shocks in one environment
> may not be so patently egregious in another.  The question of
> whether a given action "shocks the conscience" has an elusive
> quality to it.  At one end of the spectrum of culpable conduct,
> negligent behavior can never rise to the level of conscience
> shocking.  At the other end of the spectrum, actions intended to
> injure in some way unjustifiable by any government interest are
> those most likely to rise to the conscience-shocking level.  Acts
> that fall between the extremes of mere negligence and harmful
> intent require courts to make closer calls, based upon a context
> specific inquiry.

Kaucher v. Cnty. of Bucks, 455 F.3d 418, 425 (3d Cir. 2006).  Plaintiff asserts that "[t]he record
reveals that Steel clearly acted in a conscience-shocking manner" and that Foglia, Daniel,
Mescolotto and Meade "ratified" Steel's conscience-shocking actions when they "relied upon the
report of Plaintiff's [alleged residency] confession to justify the City's decision to suspend and
discharge plaintiff."  Dkt. No. 42 at 51-52.  I disagree.  Because there is sufficient evidence in
the record to allow a reasonable fact-finder to believe that defendants had a reasonable belief that
plaintiff had violated the residency requirement, defendants actions cannot be conscience
shocking.  "[A]ctions and behavior that are founded upon a reasonable basis can not be shocking

## II.     First Amendment Retaliation

Plaintiff contends that defendants violated his rights under the First Amendment by suspending and terminating him in retaliation for his comments to the Controller's office and the FBI regarding "pervasive corruption in the BRT that was detrimental to the City's taxpayers." Dkt. No. 42 at 52.  To establish his claim for retaliation under the First Amendment, plaintiff must show "(1) that the activity in question is protected by the First Amendment and (2) that the protected activity was a substantial factor in the alleged retaliatory action."  Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006).  "If these two elements are satisfied, the burden shifts to defendants to demonstrate that the same action would occur if the speech had not occurred."  Gorum v. Sessions, 561 F.3d 179, 184 (3d Cir. 2009).

### A.     Protected Activity

A statement by a public employee constitutes protected activity when

> (1) in making [the statement], the employee spoke as a citizen, (2) the statement involved a matter of public concern,[10] and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made.

Hill, 455 F.3d at 241-42.  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).  Defendants assert that plaintiff did not engage in activity protected by the First Amendment when he spoke to Bridgeman or the FBI about alleged corrupt practices by the BRT.  Dkt. No. 39 at 20.  Instead, they contend that "Plaintiff was acting in his

---

to the conscience."  Zaimes v. Cammerino, No. 09-01964, 2013 WL 4004536, at *5 (M.D. Pa. Aug. 5, 2013).

[10] "[A]llegations of corrupt practices by government officials are of the utmost public concern."  O'Donnell v. Yanchulis, 875 F.2d 1059, 1061 (3d Cir. 1989).

capacity as an employee of the BRT, not as a citizen speaking out on a matter of public concern." Id. Plaintiff, of course, claims that he was acting as a citizen when he reported his allegations of corruption in the BRT. Dkt. No. 42 at 57.

Whether an employee's speech is part of his official duties is a practical inquiry. Garcetti, 547 U.S. at 424. "[T]he critical question is whether the employer was speaking on the issue as part of his official duties or outside the scope of his employment." O'Neill v. Phila. Hous. Auth., No. 11-0173, 2011 WL 2559716, at *2 (E.D. Pa. Jun. 29, 2011). The Court must consider not only "the employee's explicit job description, but [also] his implicit obligations as a public employee." O'Neill, 2011 WL 2559716, at *3. "[T]he listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Garcetti, 547 U.S. at 424. An employee's speech may be part of his official duties "if it relates to 'special knowledge' or 'experience' acquired through his job." Gorum, 561 F.3d at 185, quoting Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007). Without more, however, this factor is not dispositive. "[T]he capacity in which a public employee speaks can sometimes be illustrated by reference to *whom* the relevant expression is directed." Baranowski v. Waters, No. 05-1379, 2008 WL 728366, at *24 (W.D. Pa. Mar. 18, 2008) (emphasis in original), vacated in part on other grounds on recons., 2008 WL 4000406 (W.D. Pa. Aug 25, 2008). "[C]omplaints up the chain of command about issues related to an employee's workplace duties – for example, possible safety issues or misconduct by other employees – are within an employee's official duties." Morris v. Phila. Hous. Auth., 487 F. App'x 37, 39 (3d Cir. 2012); see also Charles v. Grief, 522 F.3d 508, 514 (5th Cir. 2008)

(finding it significant that a public employee addressed his comments not to his superiors, but to elected representatives).

Applying the "practical" inquiry advised by Garcetti, and viewing the facts in the light most favorable to plaintiff, as I must, I find that the evidence in the record on summary judgment is sufficient to create a material question of fact as to whether plaintiff was acting in his capacity as an employee of the BRT when he informed Bridgeman and the FBI about alleged corrupt practices. Although his conversations with Bridgeman and the FBI concerned matters plaintiff learned about through his employment with the BRT, he did not make his allegations of corruption to his supervisors at the BRT. Instead, they were made to the City Controller's office, a separate City agency, and to the FBI. There is no evidence that plaintiff's discussions with Bridgeman and the FBI were conducted in the usual course of business. Further, defendants have set forth minimal evidence that plaintiff was reporting to the Controller's office or the FBI at the direction of his BRT supervisors[11] or that it was within plaintiff's official duties to report his concerns to the Controller's office or to the FBI. See Byars v. Sch. Dist. of Phila., --- F. Supp. 2d ---, No. 12-121, 2013 WL 1827373, at *13 (E.D. Pa. Apr. 30, 2013) (declining, on a motion to dismiss, to dismiss plaintiff's First Amendment retaliation claim where there was "no indication in the complaint that Plaintiff had an official duty to participate in the FBI's investigation or that Defendants commissioned Plaintiff's statements"); Griffin v. City of N.Y., 880 F.Supp.2d 384, (E.D.N.Y. 2012) (finding plaintiff who reported corruption did so as a

_____

[11]    Indeed, Bridgeman testified that Luciani initiated the meeting with the Controller's office on his own. Bridgeman Dep. at 13:4-7. When asked "How did it come about that you wanted that specific meeting?," Bridgeman answered, "I didn't. Mr. Rempfer came to me, said that . . . there was some documentation being brought over by this individual. He said, 'His name is Jim Luciani; he has something to tell us.'. . . ." Id. at 12:20-13:3. Luciani, however, testified that he had gone with a group of BRT employees to a similar "routine audit meeting" with the Controller's office in 2006. Luciani Dep. I at 88:21-89:4.

citizen rather than as an employee notwithstanding official police department policy requiring officers to report corruption up the chain of command because denying the protection of the First Amendment under those circumstances would discourage "whistleblower" activity "that is a great benefit to civil society").  Cf., Homel v. Centennial Sch. Dist., 836 F. Supp. 2d 304, 314-15 (E.D. Pa. 2011) (holding that plaintiff's First Amendment retaliation claim failed as a matter of law where she only reported alleged corrupt acts to the extent that she was required to do so as part of her job); O'Neill, 2011 WL 2559716, at *3-4 (finding the plaintiffs failed to state a claim for First Amendment retaliation where they gained knowledge of corrupt practices through their job, they reported alleged extortion only to their supervisor and, even if it was not one of their official job duties, they had a duty to report extortion).

**B.      Substantial Factor**

Defendants contend that "[e]ven if Plaintiff did engage in protected activity, he fails to produce any credible evidence that the protected activity was a substantial factor in the termination of his employment."  Dkt. No. 39 at 21.  "[P]laintiff may rely on 'a broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him."  Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007), quoting Farrell v. Planters Lifesavers, Co., 206 F.3d 271, 284 (3d Cir. 2000).  "[S]ummary judgment may be defeated when 'a reasonable inference can be drawn that an employee's speech was at least one factor considered by an employer in deciding whether to take action against the employee, the question of whether the speech was a motivating factor in that determination is best left to the jury.'"  Kovac. v. Pa. Tpk. Comm'n, 444 F. App'x 588, 590-91 (3d Cir. 2011), quoting Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 795 (3d Cir. 2000).

Defendants argue that "the FBI agents questioned plaintiff about his residency status, and the OIG began its investigation approximately a month *before* Plaintiff's meeting with Bridgeman of the Controller's Office." Dkt. No. 39 at 21 (emphasis added). Specifically, defendants assert that

> on or about September 20, 2007, the OIG was notified that the FBI agents believed Plaintiff was living in New Jersey. Plaintiff's meeting with Bridg[e]man took place in October 2007. The OIG investigated the residency question and issued its report in June 2008. It was clearly the OIG report that led to the decision in July 2008 to suspend him and to terminate his employment.

Dkt. No. 39 at 21. Plaintiff counters that he "met with the Controller's office in early September 2007 and that the OIG did not begin its investigation of Plaintiff's residency until October 2007." Dkt. No. 42 at 60 (emphasis omitted). I agree with plaintiff that the summary judgment record shows that plaintiff met with the Controller's office in early September 2007. See Bridgeman Dep. at 12:8-14 (recalling the meeting took place in "early September"). However, it also appears that the FBI had begun to investigate plaintiff in September of 2007. See Steel Dep. at 236:12-20 (""Q. Now look at all the work that you did from the beginning. . . . The only thing you did in September . . . was, you received a complaint, memo research, obtained records that Nichilo wanted correct? That's your September thing. A. Correct."). I do not find the timing of plaintiff's meeting with Bridgeman to be sufficient to establish the requisite causal link between his speech and his termination. Even if the investigation of plaintiff's residency did not begin until after he met with Bridgeman, "the mere fact that adverse employment action occurs after [a protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997), abrogated on other grounds by Burlington No. & Santa Fe. Ry. Co. v. White, 548 U.S. 53 (2006).

Defendants further argue that there is no evidence to support plaintiff's contention that, because plaintiff disclosed that Glancey "acted unilaterally to reduce property valuations at the behest of certain attorneys or certain politically-connected individuals, . . . Defendants launched a residency investigation against him and used the findings as the basis to separate him from his employment." Dkt. No. 39 at 21. Plaintiff responds that he "has produced a plethora of evidence from which a jury could reasonably find the requisite causal connection." Dkt. No. 42 at 59. Plaintiff cites, inter alia, "Meade's open hostility and antagonism toward Plaintiff when she learned of the statements Plaintiff had made to the Controller," "Davey's criticism of Plaintiff for speaking to the Controller," the fact that his Notice of Suspension was dated June 27, 2008, three days prior to his hearing and the fact that his superiors and the BRT decision makers relied on his alleged residency confession when they "were well aware that he resided in the City." Dkt. No. 42 at 59-60.

To withstand defendants' motion, plaintiff must come forward with more than his own unsupported beliefs. See Liberty Lobby, 477 U.S. at 256–57 (noting that the plaintiff must come forward with affirmative evidence). Plaintiff proffers his own testimony that both Davey and Zambrano told him that Meade was upset by plaintiff's allegations against Glancey. Luciani Dep. I at 89-90, 92-93; Luciani Dep. II at 73-75. Plaintiff's recollections of these conversations are not, however, corroborated by like testimony from Davey or Zambrano. Other than his own testimony, there is very little evidence to support plaintiff's claim of a causal link. Indeed, Zambrano testified that he believed plaintiff was charged with the residency violation because of the Lynch/Campanella allegations, and not because Meade was angry at plaintiff for saying things to Bridgeman. Zambrano Dep. at 77:6-17. Plaintiff has not produced any testimony from Meade, Mescolotto or Daniel to support a conclusion that defendants terminated him for the

alleged residency violation in retaliation for his comments about Glancey.  To establish that

defendants retaliated against plaintiff for his comments about Glancey, it is not enough for him

to show that Meade and the other BRT employees expressed annoyance at the allegation against

Glancey in a meeting with Bridgeman.  Bridgeman Dep. at 23:23-24:7.  I find that plaintiff's

theory regarding the retaliatory motive underlying his termination is speculative, at best.  As

defendants contend, "Plaintiff offers no evidence to link his conversation with Bridgeman to the

OIG's residency investigation or to his termination in July 2008."  Dkt. No. 39 at 21.  He has not

set forth sufficient evidence to allow a reasonable inference to be drawn that his comments about

Glancey were a factor defendants considered in deciding to investigate plaintiff's compliance

with the residency requirement and to suspend and terminate him for having allegedly lived in

Woodbury, New Jersey.  Absent sufficient evidence of the requisite causal connection between

plaintiff's comments about Glancey and his termination, I will grant defendants' motion for

summary judgment with respect to Counts IV and VI of plaintiff's complaint.

An appropriate Order follows.